FILED
2025 May-29 PM 05:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHWESTERN DIVISION

UNITED BENEFITS, LLC,                )
                                     )
        Plaintiff,               )
                                     )
v.                                   )
                                     )    **CASE NO. 3:24-CV-01517-LCB**
ANTHONY CAPUTO, GREGORY              )
GUENTHER, and GRANTVEST              )
FINANCIAL GROUP, LLC,                )
                                     )
        Defendants.

## ANTHONY CAPUTO'S AND GREGORY GUENTHER'S COUNTERCLAIMS

Defendants and Counterclaim-Plaintiffs Anthony Caputo ("Caputo") and

Gregory Guenther ("Guenther") state the following as their counterclaims against

Plaintiff and Counterclaim-Defendant United Benefits, LLC ("United Benefits")[1]:

## FACTUAL ALLEGATIONS

### *Caputo's and Guenther's backgrounds and their work with United Benefits*

1.    Caputo and Guenther are licensed financial professionals. They began

building their financial advising business in 2007 and have operated together as a

---

[1] Guenther, Caputo, and Defendant GRANTvest, LLC have filed motions to dismiss in this case and accordingly, have not yet filed Answers to the Complaint. (*See* Docs. 9, 10). Both motions to dismiss remain pending. Pursuant to the Court's direction during the May 28, 2025 telephone conference, only Caputo and Guenther bring these counterclaims. For the sake of clarity, GRANTvest, LLC, maintains it is not subject to this Court's jurisdiction and brings no counterclaims at this time.

full-service advisory firm since 2009.

2.      As part of their work as financial advisors, and long before they ever worked with United Benefits, Caputo and Guenther built relationships with many of their own clients, including federal employees.

3.      In 2020, Caputo and Guenther created their own SEC-registered registered investment advising firm: GRANTvest Financial Group, LLC ("GRANTvest").

4.      Caputo and Guenther officially met United Benefits in May 2015 in Palm Beach Gardens, Florida. United Benefits was pitching to a group of financial professionals the opportunity to work in the federal employee space through United Benefits's federal employee national union relationships.

5.      Caputo and Guenther began working with United Benefits as independent contractors in 2015.

6.      In their roles with United Benefits, Caputo and Guenther predominantly sold United Benefits's insurance benefits programs to federal employees in the northeastern United States.

7.      Caputo and Guenther sold these programs primarily to two federal employee unions: the National Association of Government Employees ("NAGE") and the National Treasury Employees Union ("NTEU").

8.    Caputo and Guenther each earned commissions based upon their sales of the insurance benefits programs.

9.    For the first five to six years of their work with United Benefits, Caputo and Guenther received commissions directly from the insurance carriers of the programs they were selling.

10.    In their last three to four years working with United Benefits, however, United Benefits intentionally changed the way it paid commissions to retain as much control as possible over the commissions.

11.    Pursuant to this change, for the insurance carriers who would allow it, United Benefits began paying commissions to Caputo and Guenther, rather than the commissions coming directly from the insurance carriers. Accordingly, the majority of Caputo's and Guenther's commissions began being paid through United Benefits and from United Benefits.

12.    Though they primarily covered the northeastern United States, Caputo and Guenther eventually expanded the locations they visited and their client relationships through referrals and through direct connections with their clients.

13.    Caputo and Guenther also often met with people outside of their focused locations and referred them back to United Benefits for its insurance programs.

14.     Caputo and Guenther also offered fixed index annuities (FIAs), which they had offered since long before they began working with United Benefits. They began offering FIAs through United Benefits specifically once they began working with United Benefits.

15.     When Caputo and Guenther sold an FIA, the FIA was required to be processed through an independent marketing organization ("IMO"). In addition, because Caputo and Guenther are licensed financial advisors, every FIA also had to pass through compliance at Calton and Associates, Caputo's and Guenther's broker-dealer.

16.     The IMO through which the FIAs were required to be processed was the same IMO through which United Benefits's insurance programs were processed.

17.     United Benefits received commissions directly from the insurance companies on the FIAs Caputo and Guenther sold, regardless of whether the client who bought the FIA was a federal employee or was one of Caputo's and Guenther's separate clients.

18.     Caputo and Guenther both had SEC licenses and both had FINRA licenses, which allowed them to sell securities products.

19.     United Benefits employees, on the other hand, did not have FINRA licenses at that time, and consequently, United Benefits could not sell the securities products that Caputo and Guenther were licensed to sell.

### *Caputo and Guenther each sign a "General Agent Agreement" with United Benefits*

20.    In March 2023—after they had been working with United Benefits almost eight years—Caputo and Guenther each signed a General Agent Agreement ("<u>Agreement</u>") with United Benefits. (*See* General Agent Agreement, attached as **Exhibit A**).

21.    The Agreement provides that Caputo and Guenther were independent contractors of United Benefits. (*See id.*, Section 1.1).

22.    The Agreement also provides that United Benefits would pay Caputo and Guenther commissions for selling United Benefits's insurance programs. (*See id.*, Section 4.1).

23.    The Agreement covered only the marketing of insurance programs, not any financial planning, wealth management, or retirement services.

24.    Caputo's and Guenther's financial planning business never signed any agreement with United Benefits.

25.    Caputo and Guenther had the exact same access to United Benefits customer data after they signed the Agreements in March 2023 that they had before they signed the Agreements.

*Caputo and Guenther continue to offer their own financial planning services*

26.    During the entire time they were selling United Benefits insurance programs, Caputo and Guenther also continued to offer their own financial planning services through their own practice, when appropriate.

27.    To that end, Caputo and Guenther offered United Benefits's insurance benefits programs in their roles with United Benefits and offered their own financial planning advice in their roles as financial advisors, through their own practice.

28.    United Benefits expressed its consent to this setup on numerous occasions, and Caputo and Guenther were always fully transparent with what they were doing.

29.    Indeed, United Benefits frequently referred its own clients to Caputo and Guenther. United Benefits sent at least eight clients directly to Caputo and Guenther and asked Caputo and Guenther to open investment and retirement accounts for the clients.

30.    On one occasion, United Benefits even asked Caputo and Guenther to hire another licensed advisor who did not have a firm of his own, although Caputo and Guenther ultimately decided not to hire this individual.

31.    Until 2024, United Benefits could not offer financial planning or retirement advice because it was not FINRA or SEC-licensed like Caputo and Guenther were.

32.    For the same reason, United Benefits could not offer securities products for sale or participate in commissions that were earned on securities products

33.    As Caputo's and Guenther's work with United Benefits continued, United Benefits expressed a desire to partner with them to offer services in addition to insurance benefits programs, including financial planning, retirement planning, and asset management—services that, at the time, Caputo and Guenther were licensed to offer, but that United Benefits was not.

34.    United Benefits and Caputo and Guenther talked about formally partnering, but their discussions never materialized.

35.    When a formal partnership did not materialize, in January 2024, United Benefits launched its own Registered Investment Advisor practice: United Benefits Wealth Management.

36.    Specifically, United Benefits launched United Benefits Wealth Management as a d/b/a of an RIA firm: AlphaStar Capital Management, a wholly-owned subsidiary of Financial Independence Group.

### *United Benefits terminates Caputo's and Guenther's Agreements and ceases paying their earned commissions*

37.    On October 2, 2024, without any prior notice, United Benefits sent an email to Caputo and Guenther terminating their business relationship.

38.    In the October 2, 2024 email, Jeremy Byers ("Byers"), Vice President of United Benefits, stated: "At this time, all earned commissions will remain intact

and payable as long as the agent(s) remains in good standing and doesn't act in direct conflict to United Benefits, [its] union relationships, or its clients." (Oct. 2, 2024 Email, attached as **Exhibit B**).

39.    Since the termination of their Agreements, Caputo and Guenther have not competed with United Benefits or acted in conflict to United Benefits, its union relationships, or its clients.

40.    Caputo and Guenther have never offered or marketed insurance programs since their Agreements with United Benefits terminated.

41.    Ironically, to the contrary, United Benefits's wealth management practice (United Benefits Wealth Management) appears to have been formed in 2024 for the purpose of competing directly with Caputo and Guenther after discussions to formally partner did not materialize.

42.    Despite Caputo's and Guenther's adherence to United Benefits's terms, United Benefits wrongfully stopped paying Caputo and Guenther their earned commissions.

43.    Caputo's and Guenther's unpaid earned commissions approximately total over $100,000 and continue to accrue.

### United Benefits's improper conduct continues following its termination of the Agreements

44.    In addition to failing to pay Caputo and Guenther their earned commissions, United Benefits has also improperly continued to take credit for work

done by Caputo and Guenther and has interfered with Caputo's and Guenther's existing and prospective business relationships.

45.    Throughout their time with United Benefits, Caputo and Guenther were consistently top contractors for United Benefits.

46.    As a result, United Benefits frequently requested that Caputo and Guenther represent United Benefits on financial and retirement topics, through multiple platforms.

47.    For example, United Benefits requested Caputo and Guenther speak on United Benefits's behalf at a number of regional and national NAGE and NTEU events. At these events, Caputo and Guenther were introduced as "financial and retirement professionals."

48.    United Benefits also required Caputo, Guenther, and other members of Caputo's and Guenther's team to frequently participate in marketing groups that UB required them to join.

49.    United Benefits would use Caputo's and Guenther's ideas from the marketing groups for its business, but it never compensated Caputo and Guenther for them.

50.    Moreover, United Benefits would also require Caputo and Guenther to train its own staff on insurance topics—again, without compensating Caputo or Guenther.

51.     United Benefits also requested Caputo and Guenther write articles, host webinars, and create video content on various financial and retirement topics which have been used for United Benefits. Much of Caputo's and Guenther's work product is still being used by United Benefits and is available on its website.[2]

52.     United Benefits never paid Caputo or Guenther for creating the articles, webinars, or video content, nor did it seek their consent to continue using the content after it terminated Caputo's and Guenther's agreements.

53.     Moreover, United Benefits consistently marketed Caputo and Guenther, as well as other members of GRANTvest, for its own benefit.

54.     For example, United Benefits publicly promoted Caputo and Guenther on its Facebook page, using their experience, financial licenses, and knowledge in its marketing efforts.[3]

55.     Many of these posts remain publicly available, despite United Benefits terminating its relationship with Caputo and Guenther. United Benefits did not seek

---

[2]     For example, see *Who is United Benefits*, UNITED BENEFITS, https://unitedbenefits.com/resources/who-is-united-benefits/; Gregory Guenther, *The Secure Act 2.0: A Retirement Gamechanger*, UNITED BENEFITS, https://unitedbenefits.com/the-secure-act-2-0-a-retirement-gamechanger/; Greg Guenther, *The CARES Act and Stimulus Plans*, UNITED BENEFITS (Apr. 22, 2020, 12:08 PM), https://blog.unitedbenefits.com/thecaresactandstimulusplans.

[3]     For example, see United Benefits, FACEBOOK (Jul. 17, 2023), https://www.facebook.com/share/p/1SUckqyEuy/. United Benefits made its latest post promoting a member of the GRANTvest team on July 15, 2024—less than three months before it terminated Caputo's and Guenther's agreements. United Benefits, FACEBOOK (Jul. 15, 2024) https://www.facebook.com/share/p/16XMLrDb5a/.

Caputo's or Guenther's consent to use their names or likenesses, nor to leave the posts up after it terminated their agreements and business relationship.

56.     In addition to continuing to use the content Caputo and Guenther created and their credentials, United Benefits also interfered with Caputo's and Guenther's client relationships and other business relationships.

57.     For example, before they worked with United Benefits, Caputo and Guenther had an existing relationship and referral agreement with Financial Independence Group ("FIG"), an independent insurance marketing organization.

58.     Caputo and Guenther referred United Benefits to FIG and, as a result, FIG and United Benefits began doing business together.

59.     In fact, as noted, FIG is the parent company of the RIA of which United Benefits Wealth Management is a d/b/a—the United Benefits platform that appears to have been formed to compete directly with Caputo and Guenther as financial advisors.

60.     Pursuant to their agreement with FIG, Caputo and Guenther earned referral fees from FIG for their referral of United Benefits. United Benefits knew about Caputo's and Guenther's referral agreement and that they were earning referral fees based on their referral of United Benefits.

61.     Shortly after United Benefits terminated Caputo's and Guenther's agreements, FIG sent Caputo and Guenther a letter abruptly terminating its referral

arrangement with them—despite the agreement having been in place for approximately six years.

62.    In addition, following the termination of Caputo's and Guenther's Agreements, Matthew Whitten ("Whitten"), President of United Benefits, began making false statements to third parties, including federal law enforcement officers and union chapter presidents with whom Caputo and Guenther work.

63.    Shortly after terminating the Agreements, United Benefits sent emails to union chapter leaders encouraging the unions to stop doing business with Caputo and Guenther.

64.    United Benefits has also falsely told at least one federal law enforcement officer that Caputo and Guenther had federal complaints against them.

65.    United Benefits has also falsely told union leaders through emails and phone calls that Caputo and Guenther were stealing from United Benefits and from their former co-workers.

66.    As just one example, during the week of May 12, 2025, Whitten participated in a telephone call regarding Caputo and Guenther with Byers and Scott Polhemus ("Polhemus"), a federal law enforcement officer with U.S. Customs and Broder Protection and the president of a local NTEU chapter with whom Caputo and Guenther work.

67.     On the call, speaking as president of United Benefits and on its behalf, Whitten made multiple blatantly false statements to Polhemus regarding Caputo and Guenther.

68.     First, Whitten stated that Caputo and Guenther had stolen tens of thousands of dollars in commissions from their former co-workers at United Benefits.

69.     Second, Whitten stated that Caputo and Guenther had stolen from United Benefits itself.

70.     Third, Whitten stated that someone from GRANTvest, implied to be Caputo or Guenther, had sexually solicited a former co-worker's "little daughter."

71.     Upon information and belief, Whitten or other agents of United Benefits have made similar statements to other individuals and union chapter contacts.

72.     Likely as a result of such statements and others, some chapter leaders from NAGE, with whom Caputo and Guenther previously worked regularly, ceased all contact with Caputo and Guenther.

## <u>COUNT I – BREACH OF CONTRACT</u>

73.     Caputo and Guenther re-state and re-allege paragraphs 1-72.

74.     Caputo and Guenther and United Benefits are parties to the Agreement, which is a valid, enforceable contract in which United Benefits agreed to pay commissions to Caputo and Guenther.

75.     Caputo and Guenther have fully performed their obligations under the Agreement and have not breached the Agreement.

76.     United Benefits has breached its obligations under the Agreement by withholding Caputo's and Guenther's earned commissions.

77.     As a direct and proximate result of United Benefits's breach, Caputo and Guenther have suffered, and will continue to suffer, damages.

WHEREFORE, Caputo and Guenther demand relief against United Benefits in the form of an award of compensatory damages, consequential damages, incidental damages, costs, attorney's fees, and any other damages available under the Agreement, at law, or in equity.

## COUNT II – UNJUST ENRICHMENT

78.     Caputo and Guenther re-state and re-allege paragraphs 1-72.

79.     Caputo and Guenther have conferred benefits on United Benefits by selling United Benefits's insurance benefits programs in accordance with the Agreement.

80.     United Benefits has failed to pay Caputo and Guenther the commissions they earned by making sales, and it would be inequitable and unfair to allow United

Benefits to retain the benefit of these sales without paying Caputo and Guenther the commissions they are owed.

81.    Further, Caputo and Guenther have conferred benefits on United Benefits by creating content and allowing their names, faces, and credentials to be featured on United Benefits's online platforms, at United Benefits's request.

82.    United Benefits has failed to pay Caputo or Guenther or seek their consent for the continued use of the content, and it would be inequitable and unfair to allow United Benefits to retain the benefit of this content without paying Caputo and Guenther for their work.

83.    Due to United Benefits's wrongful actions, United Benefits has been unjustly enriched.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, costs, attorney's fees, and all other relief available at law or in equity.

## **COUNT III – FRAUD/PROMISSORY FRAUD/DECEIT**

84.    Caputo and Guenther re-state and re-allege paragraphs 1-72.

85.    In the October 2, 2024 email, United Benefits, through its Vice President Jeremy Byers, represented that it would continue to pay earned commissions to Caputo and Guenther.

86.    United Benefits's representation was false because it has not paid Caputo and Guenther their earned commissions.

87.    United Benefits knew its representation was false and intended Caputo and Guenther to rely on its representation.

88.    Caputo and Guenther reasonably relied on this misrepresentation to their detriment.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, punitive damages, costs, attorney's fees, and all other relief available at law or in equity.

## COUNT IV –NEGLIGENT MISREPRESENTATION

89.    Caputo and Guenther re-state and re-allege paragraphs 1-72.

90.    In the October 2, 2024 email, United Benefits, through its Vice President Jeremy Byers, represented that it would continue to pay earned commissions to Caputo and Guenther.

91.    United Benefits's representation was false because it has not paid Caputo and Guenther their earned commissions.

92.    United Benefits was at least negligent in making the misrepresentation.

93.    Caputo and Guenther reasonably relied on this misrepresentation to their detriment.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, costs, attorney's fees, and all other relief available at law or in equity.

## COUNT V – DEFAMATION

94.    Caputo and Guenther re-state and re-allege paragraphs 1-72.

95.    United Benefits, through its agent Whitten, made false and defamatory statements to union leaders and other individuals concerning Caputo and Guenther.

96.    United Benefits's statements are unprivileged communications to third parties.

97.    United Benefits's statements are defamation *per se* because they accused Caputo and Guenther of criminal conduct and prejudiced Caputo's and Guenther's professional and business reputations.

98.    United Benefits made these statements negligently, recklessly, or intentionally.

99.    Caputo and Guenther have been damaged and will continue to be damaged by United Benefits's statements.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, costs, attorney's fees, and all other relief available at law or in equity.

## COUNT VI – TORTIOUS INTERFERENCE

100.    Caputo and Guenther re-state and re-allege paragraphs 1-72.

101.    Caputo and Guenther have existing and prospective protectable business relationships with their clients, with union chapter leaders, and with other individuals and organizations, including referral sources, through their financial planning business.

102.    United Benefits was aware of the existence of Caputo's and Guenther's existing and prospective relationships with their clients and with union chapter leaders.

103.    United Benefits was at all times a stranger to Caputo's and Guenther's business relationships.

104.    United Benefits intentionally interfered with Caputo's and Guenther's business relationships by, among other things, publishing false statements about Caputo and Guenther for the purpose of inducing a breach or termination of Caputo's and Guenther's business relationships.

105.    Caputo and Guenther have been damaged and will continue to be damaged by United Benefits's actions.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, costs, attorney's fees, and all other relief available at law or in equity.

## COUNT VII – INVASION OF PRIVACY: COMMERCIAL MISAPPROPRIATION

106.    Caputo and Guenther re-state and re-allege paragraphs 1-72.

107.    Caputo's and Guenther's names and/or likenesses are commercially valuable.

108.    United Benefits has appropriated Caputo's and Guenther's names and/or likenesses for its own use and benefit by, for example, marketing Caputo's and Guenther's profiles on its online platforms and touting their accompanying experience and credentials, after it terminated Caputo and Guenther and without Caputo's and Guenther's consent.

109.    United Benefits's appropriation was for the purpose of appropriating the commercial values of Caputo's and Guenther's names and/or likenesses.

110.    United Benefits has received commercial benefits from its appropriation of Caputo's and Guenther's names and/or likenesses.

111.    Caputo and Guenther have been damaged and will continue to be damaged by United Benefits's actions.

WHEREFORE, Caputo and Guenther demand relief against United Benefits, including an award for damages, costs, attorney's fees, and all other relief available at law or in equity.

Dated May 29, 2025

*/s/ Victor L. Hayslip*
Victor L. Hayslip (HAY019)
Benjamin B. Coulter (COU027)
Molly M. Glisson (GLI005)

*Attorneys for Defendants Anthony Caputo,*
*Gregory Guenther, and GRANTvest*
*Financial Group, LLC*

**OF COUNSEL:**
BURR & FORMAN LLP
420 North 20th Street
Suite 3400
Birmingham, AL  35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
vhayslip@burr.com
bcoulter@burr.com
mglisson@burr.com

**CERTIFICATE OF SERVICE**

I hereby certify that I have served a copy of the foregoing document by Notice of Electronic Filing, or, if the party served does not participate in Notice of

Electronic Filing, by U.S. First Class Mail, hand delivery, fax or email on this the

29th day of May, 2025:

Sam David Knight
Christopher B. Driver
Badham & Buck, LLC
2001 Park Place North, Ste. 500
Birmingham, Alabama 35203
sdknight@badhambuck.com
cdriver@badhambuck.com

*/s/ Victor L. Hayslip*
OF COUNSEL
